EDNA CONBOY MARTINDELL, PLAINTIFF-RESPONDENT, v. JACKSON MARTINDELL, DEFENDANT-APPELLANT.

Argued March 12, 1956—Decided April 23, 1956.

■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■

*Mr. Edward R. McGlynn* argued the cause for the appellant (*Mr. Paul J. O'Neill,* attorney; *Mr. Roger H. McGlynn,* on the brief).

*Mr. John J. McCloskey* argued the cause for the respondent (*Messrs. Levy, Fensler & McCloskey,* attorneys).

The opinion of the court was delivered by

JACOBS, J.   The defendant appealed to the Appellate Division from an order of the Chancery Division which granted a retroactive increase of alimony to the plaintiff and awarded a counsel fee to her attorneys.   The defendant's notice of appeal was filed eight days beyond the period prescribed in the rules and the Appellate Division denied a motion for extension under *R. R.* 1:27B.   We granted certification on the defendant's application.

In 1921 the plaintiff married the defendant and in 1933 she divorced him.   Custody of their three children (Edna M., Robert E. and David J.) was awarded to her and pursuant to an agreement she was allowed $600 per month for alimony plus $100 per month under an annuity policy which had been purchased for her.   In 1945 a consent order reducing her alimony was entered in the Court of Chancery.   It set forth that Edna had become 21 years of age in 1943 and had married and that Robert had "become emancipated." It provided that the plaintiff should receive (in addition to the $100 per month under the annuity policy) $465 per month to be allocated as follows:   $300 per month as alimony and $165 per month for the support of David until he reached his eighteenth birthday or until further order of the court.   In 1947 another consent order reducing alimony was entered in the Court of Chancery.   It set forth that David had reached his eighteenth birthday and that the defendant had undertaken his "care, support, maintenance and tuition."   It provided that the plaintiff should receive

(in addition to the $100 per month under the annuity policy) $300 per month "for alimony, support and maintenance of the said Edna Conboy Martindell."

In 1951 the plaintiff filed notice that she would apply to the Chancery Division for an increase in alimony. Her supporting affidavit set forth that her net income was $4,126; that the cost of living had risen and she found it impossible to set aside savings to meet any emergencies or provide for her sustenance in the event the defendant predeceased her; that she lived in an East Orange apartment which was inadequate for her needs and for the needs of her children and grandchildren when they visited her; and that the defendant, whose reputed wealth was "in excess of two million dollars," traveled extensively and lived lavishly with his third wife at Princeton where he maintained "a household requiring two servants and nurse as well as other employees." In his answering affidavit the defendant denied that he lived lavishly and asserted that his extensive travels were in connection with his business. He stated that he considered the plaintiff's apartment accommodations to be "fully adequate for her needs"; that it was inconceivable to him that the plaintiff had been unable to set aside a substantial sum as savings "if she lived within her means"; and that he was now willing "without prejudice" to increase the sum which he was paying to the plaintiff "to an amount sufficient to meet the 18% cost of living increase." After the affidavits were filed formal hearings were held in the Chancery Division on various dates between March 1952 and September 1954. A settlement conference was held on October 19, 1953 between the court and counsel. The defendant's counsel asserts his understanding that if a settlement was consummated it was to be effective as of October 19, 1953. The plaintiff's counsel asserts his understanding that whatever order the court entered was to be retroactive to October 19, 1953. In any event, the settlement negotiations failed and the hearings proceeded.

During the hearings the plaintiff testified that while she was married to the defendant her family lived very com-

fortably. In 1932 she and her children, accompanied by a governess, had been to the Riviera, Paris, Nice and Cannes. When they returned to the United States they lived in a large house in South Orange with several servants and she was given $800 a month "to run the house" exclusive of department store charges and other expenditures. She testified that, in contrast, she now lives in an apartment without the services of any maid, laundress or other domestic help. She has no automobile because she can "no longer afford to pay $18 a month garage and the upkeep." Her apartment is furnished "very poorly" and she has had no new furniture "for over twenty years." She has no source of income except from the defendant and she pays income taxes on the sums received from him. She has been unable to accumulate any savings and has been unable to accommodate properly her children and grandchildren during their visits with her. In explanation of her consents to the reduction orders of 1945 and 1947 she testified as follows:

"The fact is, each time the question of my children's education was to come up to go to college, he would say, 'If you want the children properly educated, you will just have to take what I feel you are deserving, and I will send these children to college.' Knowing my sons and daughter wanted a college education, and I wanted it for them so badly, I would consent to take a smaller income, so that it would help my children to go through college. Consequently, I stayed in the background until my sons graduated from college * * *."

Prior to the entry of the 1933 divorce decree and the 1945 and 1947 reduction orders, no judicial inquiry was made as to the defendant's financial condition. However, in the present proceeding, evidence on that issue was taken and, although the defendant's testimony was neither complete nor satisfactory, there is enough in the record to establish that he is wealthy, has a substantial current income, and a high potential of earnings. It also seems fairly inferable that his financial resources and annual income increased significantly during the period after the last reduction order was entered in 1947. He is a financial consultant and eco-

nomic adviser and is the dominating influence in the American Institute of Management which he described as "a non-profit educational foundation to advance professional management by means of establishing in America the science of management audit in the same way the science in financing audits was established about fifty years ago." He is a large stockholder of Normandy Farms, a Delaware corporation, and exercises actual control of its operations. He testified that he looked upon Normandy Farms as a "financial convenience" and his accountant, Miss Lord, testified with respect to his annual advances thereto and withdrawals therefrom; the largest were in 1953 when he advanced $210,000 and withdrew $50,000. Miss Lord testified further that as of August 31, 1954 Normandy Farms had "net assets of $485,-316, liabilities $259,760, net capital $225,556"; of the liabilities, $200,000 represented indebtedness to the defendant. In 1947 the net assets of Normandy Farms approximated $118,000.

There is ample evidence in the record to establish the defendant's very substantial earning capacity. Miss Lord testified that in 1952 he received $47,138.47 from various public utilities for services rendered as a consultant; in 1953 such fees aggregated $81,507; and through August 1954 they aggregated $17,825. The heavy expenses which he reported in connection therewith were paid to the American Institute of Management which also received many outright contributions from him. His 1952 net income was stated to be approximately $27,000 and his contribution to the Institute during that year was reported at $10,000. While testifying in October 1953 the defendant suggested that his health would no longer permit him to continue his extensive activities but he introduced no supporting medical evidence and Miss Lord's testimony indicated that his consulting work thereafter was still substantial. In any event we consider it unnecessary to pursue the matter or to present any further details as to the defendant's wealth and income. His brief on appeal does not question the Chancery Division's findings with respect to his favorable financial status nor does it

contain anything to dispute the pertinent inferences which we have drawn. On the contrary, it rests upon the position that the evidence relating to the changes in the plaintiff's circumstances since the last reduction order of 1947 did not warrant the increase granted to her. The Chancery Division, by order dated May 23, 1955, increased the plaintiff's alimony from $300 to $550 per month (in addition to the $100 per month under the annuity policy). The increase was made retroactive to October 19, 1953 and the defendant was directed to pay a counsel fee to the plaintiff's attorneys in the sum of $4,500. On appeal, the defendant contends that the increase was excessive although he has renewed his consent to an 18% increase to meet the rise in the cost of living. He also contends that the increase should not be retroactive and that the counsel fee should be reduced. Before we deal with the merits of these contentions we shall consider the plaintiff's point that the Appellate Division did not err in refusing to grant the application for extension and that the defendant's appeal should therefore be dismissed as having been taken out of time.

Under our practice rules, as originally adopted, the time for taking an appeal could not be extended under any circumstances. See *In the Matter of Estate of Horton,* 1 *N. J.* 571 (1949), *certiorari* denied *Gay v. Fidelity Union Trust Co.,* 337 *U. S.* 945, 69 *S. Ct.* 1502, 93 *L. Ed.* 1748 (1949); *In re Pfizer's Estate,* 6 *N. J.* 233, 238 (1951); *Stern v. Glasser,* 10 *N. J.* 596, 599 (1952). Occasionally, therefore, an appeal was dismissed because the appellant's notice of appeal was inadvertently filed several days beyond the allowable 45-day period, even though the respondent was in nowise harmed by the delay. The resulting injustice suggested the need for a practice change and on January 1, 1953 this court adopted an amendment which permitted the appellate court to grant an appropriate extension not over 30 days "upon a clear showing of a good cause and the absence of prejudice." See *Rule* 1:7–9; *R. R.* 1:1–9; *R. R.* 1:27B; *Monica v. Monica,* 25 *N. J. Super.* 274, 278 (*App. Div.* 1953). *Cf. In re Nuese's Estate,*

15 *N. J.* 149, 159 (1954); *In re Erie Railroad System,* 19 *N. J.* 110, 141 (1955). In the instant matter the Chancery Division's order, although entered on May 23, 1955, was not served upon counsel for the defendant until June 2, 1955. See *R. R.* 4:5–1. He mistakenly computed the 45-day period from the date of the service rather than the entry of the order and he concluded that the time for appeal would expire on July 17, 1955. He filed his notice of appeal on July 15, 1955 but later discovered that he should have filed it by July 7, 1955. On July 28, 1955 he served notice on the attorneys for the plaintiff that on August 8, 1955 he would apply to the Appellate Division for an order extending the time for the filing of his appeal. Following argument of the motion on August 8, 1955 the Appellate Division, without filing any opinion, entered an order denying his application. Thereafter the plaintiff moved to dismiss the appeal but no action was taken by the Appellate Division because of the pendency of the defendant's application to this Court for certification.

We are satisfied that the plaintiff was in nowise prejudiced by the short delay in the filing of the notice of appeal; indeed her brief contains no suggestion to the contrary although a goodly portion of it is devoted to her procedural contentions. And we are equally satisfied that the inadvertence of the defendant's counsel may justly be deemed to constitute a showing of good cause within *R. R.* 1:27B. See *Hogan v. Hodge,* 6 *N. J. Super.* 55, 60 (*App. Div.* 1949); *De Santa v. Nehi Corporation,* 171 *F. 2d* 696, 698 (*2d Cir.* 1948). It is true, as the plaintiff points out, that litigants are generally held bound by the mistaken as well as the sound procedural determinations of their counsel. *Karcher v. Philadelphia Fire and Marine Ins. Co.,* 19 *N. J.* 214, 216 (1955); *State v. Newman,* 36 *N. J. Super.* 506, 511 (*App. Div.* 1955). But the rule is not an absolute one and is to be applied rationally and with fair recognition of the fact that justice to the litigants is always the polestar. See *Devlin v. Surgent,* 18 *N. J.* 148, 153 (1955); *New Jersey Highway Authority v. Renner,* 18 *N. J.* 485, 495 (1955).

If the plaintiff had served the order of May 23, 1955 immediately upon its entry the confusion would have been avoided; in any event she knew on July 15, 1955 that the defendant had taken an appeal from the order which culminated the protracted hearings in the Chancery Division and although that was eight days beyond the 45-day limit she had in the meantime done nothing in reliance upon the belief that there would be no appeal. Indeed, her counsel was well aware that notwithstanding the lapse of the 45-day period there still remained the 30-day grace period during which an appeal might be inaugurated strictly within the prescribed terms of *R. R.* 1:27*B*. The plaintiff suggests that since the defendant's motion for extension was not made returnable within the 30-day period but was made returnable on the 32nd day after the original time for appeal had expired, *R. R.* 1:27*B* may not be invoked at all. Passing the larger practice questions which will be eliminated by the adoption of the proposed clarifying amendment of *R. R.* 1:27*B* (see 79 *N. J. L. J.* 115) we need simply point out that the defendant's motion in the instant matter may readily be viewed as though it were returnable on the 30th day since the two days preceding August 8 were *dies non*— they were Sunday August 7 and Saturday August 6 which was declared as a public holiday by *L.* 1955, *c.* 196 (*N. J. S. A.* 36:1–1.1). See *R. R.* 1:27; *State v. Rhodes,* 11 *N. J.* 515 (1953); *Poetz v. Mix,* 7 *N. J.* 436 (1951). *Cf. Meyers v. Mayor, etc., Borough of East Paterson,* 37 *N. J. Super.* 122 (*App. Div.* 1955), affirmed 21 *N. J.* 357 (1956).

We have concluded that the Appellate Division should have granted the defendant's application for extension and that the plaintiff's motion to dismiss the appeal must be denied. The hearings in the Chancery Division were extensive and the issue between the parties bore on the payment of alimony which is a continuing obligation subject to continuing review. *Parmly v. Parmly,* 125 *N. J. Eq.* 545, 550 (*E. & A.* 1939); *Kirshbaum v. Kirshbaum,* 125 *N. J. Eq.* 558, 561 (*E. & A.* 1939); *O'Hara v. O'Hara,* 137 *N. J. Eq.* 369, 375 (*E. & A.* 1945). The earlier orders were

not preceded by any significant judicial inquiry and this was the first occasion on which there had been any investigation of the defendant's means. See *Kirshbaum v. Kirshbaum, supra; Parmly v. Parmly, supra.* The real interests of justice would clearly have been served better if the broad discretionary power under *R. R.* 1:27B had been immediately exercised by the Appellate Division in the defendant's favor instead of remitting him to a later original proceeding designed to obtain ultimate determination and appellate review of the extent of his alimony obligation to the plaintiff. In any event, we reject the plaintiff's procedural contentions and come without further delay to the actual merits of the appeal which the parties have argued fully *pro* and *con* before this court. *Cf.* 6 *Moore's Federal Practice* (2d ed. 1953), § 54.43[4], at 291; 7 *Id.* (2d ed. 1955), § 73.09[6], at 3148, *fn.* 3.

The husband's duty to support and maintain his wife was firmly established at common law. *Bonanno v. Bonanno,* 4 *N. J.* 268, 273 (1950) ; *Turi v. Turi,* 34 *N. J. Super.* 313, 320 (*App. Div.* 1955). And although absolute divorces were granted at common law by the ecclesiastical courts only for such causes as rendered the marriages void *ab initio* and entailed no incidental support or alimony, limited divorces were granted for other causes and in such instances the ecclesiastical courts ordered appropriate payments of support or alimony. *Lynde v. Lynde,* 64 *N. J. Eq.* 736, 751 (*E. & A.* 1902) ; *O'Loughlin v. O'Loughlin,* 12 *N. J.* 222, 231 (1953) ; *Vernier and Hurlbut, The Historical Background of Alimony Law and Its Present Statutory Structure,* 6 *Law & Contemp. Problems,* 197 (1939). In our own State support or alimony for the wife has been an incident of divorce proceedings since the act of December 2, 1794 which vested jurisdiction in the Court of Chancery in divorce cases, specified the grounds for divorce, and provided that the court may make such order relating to the wife's alimony as "may be fit, equitable and just." *Lynde v. Lynde, supra; Herr, Marriage, Divorce and Separation* (2d ed. 1950) (10 *New Jersey Practice*), § 274. Later enactments carried forth

similarly comprehensive authority which is now found in *N. J. S.* 2A:34–23. It is to be noted that the Legislature did not at any time attempt to enumerate the individual factors to be considered by the court in fixing the amount of alimony; instead it left the matter to sound judicial discretion to be exercised in the light of the circumstances and the nature of the case. See *O'Neill v. O'Neill,* 18 *N. J. Misc.* 82 *(Ch.* 1939), affirmed 127 *N. J. Eq.* 278 *(E. & A.* 1940); *Herr, supra,* § 430.

In the leading case of *Dietrick v. Dietrick,* 88 *N. J. Eq.* 560, 561 *(E. & A.* 1918), Justice Trenchard pointed out that alimony was the method of enforcing the continuing duty of support which the husband owed his wife and which he could not disavow by misconduct resulting in divorce; with respect to its amount, he noted that no rigid standard could be prescribed and that although the wife's needs and the husband's means were major considerations they were not the exclusive ones. As he tersely put it: "There should be taken into account the physical condition and social position of the parties, the husband's property and income, including what he could derive from personal attention to business, and also the separate property and income of the wife. Considering all these, and any other factors bearing upon the question, the sum is to be fixed at what the wife would have the right to expect as support if living with her husband." Expressions of like effect are found in many recent decisions of our courts. See *Mowery v. Mowery,* 38 *N. J. Super.* 92, 105 *(App. Div.* 1955); *Turi v. Turi, supra; Testut v. Testut,* 34 *N. J. Super.* 95, 100 *(App. Div.* 1955); *cf. Bonanno v. Bonanno, supra.*

After alimony is fixed in the original divorce judgment it may be altered by the court upon application by either party; indeed *N. J. S.* 2A:34–23 which deals with alimony orders expressly provides that such orders "may be revised and altered by the court from time to time as circumstances may require." In *Cohen v. Cohen,* 15 *N. J. Misc.* 666, 668 *(Ch.* 1937), the court pointed out that the statute contained no reference to altered circumstances and

suggested that an application for modification of alimony "should be decided in accordance with the very right of the matter at the time it is before the court for disposition" and should not turn on a showing of "changed circumstances and new facts." Notwithstanding the arguments there advanced the New Jersey cases have adhered to the doctrine that the party who seeks a modification of an alimony order has the burden of establishing that changed circumstances call for the relief sought. See *Boorstein v. Boorstein*, 142 *N. J. Eq.* 135, 136 (*E. & A.* 1948); *McLeod v. McLeod*, 131 *N. J. Eq.* 44, 46 (*E. & A.* 1942); *Storch v. Storch*, 7 *N. J. Super.* 97, 99 (*App. Div.* 1950); *Herman v. Herman*, 17 *N. J. Misc.* 127, 129 (*Ch.* 1939). Where the original alimony order was preceded by and was based upon a full and fair judicial inquiry the doctrine may have considerable merit, for neither the courts nor the parties should be heavily burdened with a belated re-examination of the original facts and the justice of the terms of the original order entered thereon. Where, however, there was never any such judicial inquiry, the doctrine may have much less force. See *Parmly v. Parmly, supra; Kirshbaum v. Kirshbaum, supra. Cf. Cohen v. Cohen, supra.*

In any event, the record in the instant matter contains adequate evidence of changed circumstances since the entry of the original alimony order of 1933 and the reduction orders of 1945 and 1947. The plaintiff's testimony as to the reasons underlying her consents to the 1945 and 1947 reduction orders and her 1951 application for increased alimony was clear and persuasive. She was willing to live at a reduced scale while her children's education was being taken care of appropriately by the defendant. After their education had been completed she endeavored to maintain herself within the reduced amount but found it increasingly difficult to do so. The costs of living were persistently rising and her living facilities were decreasing with equal persistency. She was obliged to give up her car and to maintain her apartment without domestic help of any kind and she was in no position to replace her furniture which was over twenty years

old. She found it impossible to retain reasonable savings which she should justly be permitted to accumulate against the day when alimony payments may cease because of her husband's death. See *Herr, supra,* § 273; *Bernstein, Termination of Alimony Upon Death of Husband,* 61 *N. J. L. J.* 85 (March 10, 1938); 67 *Harv. L. Rev.* 1074 (1954); 35 *B. U. L. Rev.* 596 (1955). She found she was unable to accommodate her children and grandchildren suitably during their visits with her. In recent years her children have established their own families and she has the natural desire as mother and grandmother to receive and entertain them. She testified during one of the hearings in the Chancery Division that her daughter visited her as frequently as she could and that she was going to take care of her grandchild while her daughter and husband went to Florida on vacation. She also testified that her grandchildren visited "over Washington's Birthday for five days" and that she put up army cots for sleeping accommodations. While there was testimony by her son David and her son-in-law Frederick which tended to minimize the number of visits by the plaintiff's children and grandchildren, it must be considered in the light of the fact that David and Frederick were apparently the recipients of financial benefits from the defendant. In all, we are satisfied that her children and grandchildren did visit the plaintiff on many occasions and that the plaintiff had the right to expect, especially with the advancing years, that she would continue to have the material pleasures incident to receiving and entertaining them in fitting manner. It must be remembered that she had been married to the defendant for 12 years and was awarded full custody of their three children when she divorced him in 1933 for his misconduct and that it was she who alone took care of their children for many years thereafter until their adulthood and emancipation.

Not only has the plaintiff's financial condition worsened since the entry of the original alimony order of 1933 and the reduction orders of 1945 and 1947 but the defendant's financial condition has bettered. At oral argu-

ment the defendant's counsel took the position that we should be concerned only with the plaintiff's increased needs and not at all with the defendant's increased wealth and income or income potential. We take a wholly different view of the matter. When an application for alteration of alimony is presented, the court should justly consider all relevant circumstances, including particularly the changed needs of the former wife and the changed financial resources of the former husband. If his resources have substantially decreased he may seek a reduction on that ground alone or on that plus other pertinent grounds. See *Traudt v. Traudt,* 116 *N. J. Eq.* 75, 80 (*E. & A.* 1934); *Williams v. Williams,* 12 *N. J. Misc.* 641 (*Ch.* 1934); *cf. Padwee v. Padwee,* 7 *N. J. Super.* 101 (*App. Div.* 1950); *Herr, supra,* § 441; *Annotation, Change in financial condition or needs of husband or wife as ground for modification of decree for alimony or maintenance,* 18 *A. L. R. 2d* 10, 30 (1951). If, on the other hand, his resources have substantially increased then his former wife may fairly seek an increase upon an affirmative showing that a higher award of alimony would be "fit, reasonable and just" (*N. J. S.* 2A:34–23) in view of all of the circumstances then prevailing. See *Foote v. Foote,* 68 *A.* 467 (*N. J. Ch.* 1908) (not officially reported); *Erickson v. Erickson,* 181 *Minn.* 421, 232 *N. W.* 793 (1930); *Humbird v. Humbird,* 42 *Idaho* 29, 243 *P.* 827 (1926); *Desvernine, Grounds for the Modification of Alimony Awards,* 6 *Law & Contemp. Problems,* 236, 241 (1939). See also *Lasasso v. Lasasso,* 1 *N. J.* 324, 329 (1949). But *cf. Roskein v. Roskein,* 25 *N. J. Super.* 415, 427 (*Ch.* 1953).

Every application for alimony or increased alimony rests upon its own particular footing and the appellate court must give due recognition to the wide discretion which our law rightly affords to the trial judges who deal with these matters. See *Richmond v. Richmond,* 2 *N. J. Eq.* 90, 92 (*Ch.* 1838); *Dale v. Dale,* 13 *N. J. Super.* 59, 62 (*App. Div.* 1951). Giving fair and studied consideration to the plaintiff's current needs, the defendant's current wealth, income and income potential, and all the other relevant

factors, we cannot say that the trial judge in the instant matter exceeded his discretionary power in granting an increase of alimony from $300 to $550 per month. *Cf. Munger v. Munger,* 21 *N. J. Super.* 49, 57 (*Ch.* 1952), affirmed 24 *N. J. Super.* 574 (*App. Div.* 1953). Nor do we find any error in his action which made the increase retroactive to October 19, 1953. The court had authority to grant relief to the plaintiff from the date of her application in 1951. *Swallow v. Swallow,* 84 *N. J. Eq.* 411 (*Ch.* 1915); *Herr, supra,* § 432. He did not do so but chose a much later date on which an unsuccessful settlement conference was held. The plaintiff had received no increase whatever *pendente lite* and the long delay in the Chancery Division was largely due to the defendant's reluctance to disclose his financial resources. The provision which made the alimony increase retroactive to October 19, 1953 was clearly neither unreasonable nor unjust.

The final point requiring our attention is the defendant's attack on the allowance of counsel fee which is also a matter resting generally within the trial court's discretion. See *R. R.* 4:55–7(*a*); 11 *Herr, supra,* § 1011 *et seq. Cf. Lasasso v. Lasasso, supra; Turi v. Turi, supra.* An affidavit of services executed by a member of the long established firm of attorneys representing the plaintiff set forth that "there were 14 appearances in court totalling 12½ days and approximately 200 hours were spent on this matter, exclusive of the court appearances." As has been indicated, the protracted proceedings were in large part necessitated by the defendant's resistant attitude. The belated filing of his notice of appeal resulted in more delay and in intermediate appellate steps which might readily have been avoided. Counsel for the plaintiff has applied to this court for an additional allowance but we have concluded that the amount granted by the trial court, which we shall not disturb, was fairly sufficient to include the services rendered on appeal as well as those rendered below. The plaintiff may, however, have her actual disbursements taxed as part of her costs. See *R. R.* 1:9–2.

The order entered in the Chancery Division on May 23, 1955 is in all respects:
Affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For reversal*—None.