**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1624-20

SUZANNE CARDALI,

    Plaintiff-Respondent,

v.

MICHAEL CARDALI,

    Defendant-Appellant.

_____

Argued April 4, 2022 – Decided June 27, 2022

Before Judges Messano, Enright and Marczyk.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Somerset County, Docket No. FM-18-0596-06.

Taryn R. Zimmerman argued the cause for appellant (DeTommaso Law Group, LLC, and Einhorn, Barbarito, Frost & Botwinick, attorneys; Taryn R. Zimmerman, Katrina M. Xyloportas, Matheu D. Nunn and Jessie M. Mills, on the briefs).

Thomas D. Baldwin argued the cause for respondent (Chiesa Shahinian & Giantomasi, PC, attorneys; Thomas D. Baldwin and Joseph Stimmel, on the brief).

PER CURIAM

Defendant Michael Cardali appeals from the January 8, 2021 order denying his requests to modify or terminate his alimony obligation and have plaintiff Suzanne Cardali reimburse him for a portion of their son's college expenses.[1] We affirm.

I.

The parties are fifty-nine years old and were married for approximately eighteen years. They have two children, now ages twenty-six and thirty years old.

In October 2006, the parties executed a property settlement agreement (PSA) which was incorporated into their December 2006 dual judgment of divorce. The PSA resolved various issues between the parties, including alimony and the allocation of responsibility for the children's college expenses.

Specifically, pursuant to the PSA, defendant agreed to pay alimony at the rate of $5,417 per month, "based upon [plaintiff's] imputed annual gross income of $25,000 and [defendant's] annual base income of $162,600 gross consisting of his regular salary of $120,000 plus his Incentive Compensation of $36,000

[1] Although the January 8 order also reflects the denial of additional relief to the parties, we limit our discussion to those portions of the order related to the issues raised on appeal.

A-1624-20

plus $6,600 automobile allowance." The PSA also provided defendant would pay additional alimony totaling "fifty percent . . . of the first $100,000 of his annual key manager bonus paid out in 2007 and thereafter." Further, the PSA reflected alimony would terminate upon plaintiff's "remarriage or cohabitation (as defined by [New Jersey] Law) or [either party's] death, whichever occur[red] first."

Regarding the parties' responsibility for their children's college expenses, the PSA stated the children had to first "apply for all available scholarships, grants and loans." Thereafter, "[a]ny shortfall in a child's education expenses" would "be paid by the parties in proportion to their ability to pay at that time after giving consideration to income, alimony paid and received, assets and liabilities."

## II.

Both during the marriage and after the divorce, defendant worked for Somerset Tire Services, Inc. (STS) as Vice President of Information Technology. STS was sold to "Mavis" in 2015. After the sale, defendant remained employed by Mavis pursuant to an August 2015 employment agreement negotiated between STS and Mavis. He reported the following gross income on his tax returns for the period between 2013 and 2016:

2013: $228,000
2014: $326,000
2015: $967,000
2016: $476,000

Months after defendant signed his employment agreement with Mavis, he was informed he was no longer "a necessary employee," and his relationship with Mavis "was severed." Claiming "Mavis did not have 'good reason' to terminate" him, defendant hired counsel and reached a settlement with his former employer. Defendant did not provide the trial court with a copy of his severance agreement with Mavis, nor the particulars of the settlement.[2]

After leaving Mavis, defendant sought comparable employment for approximately eighteen months. Although he reported no W-2 wages in 2017, he eventually secured a license with the SEC as an investment advisor and began working with Equitable Advisors, LLC (Equitable) in June 2018. His earnings from Equitable in 2018 and 2019 were $30,815 and $31,855, respectively.

By the time the parties appeared before the trial court in January 2021, plaintiff was unemployed. In fact, as of December 2020, her earnings totaled $11,310, including $290 in unemployment income. She claimed her ability to

---

[2] During argument on January 8, 2021, after plaintiff's counsel noted defendant had not provided a copy of his severance agreement to the trial court or plaintiff, defendant's attorney stated, "[w]e have nothing to hide. . . . They want a severance agreement, they can have it under a protective order."

4

earn was "limited" due to various health issues and that she "depend[ed] on [her] alimony for support." She also certified that in the years leading up to the onset of COVID-19 in 2020, she worked varying hours as a registered dental hygienist. In 2016, she earned slightly under $10,000 and in 2017, almost $23,000. She also reported earnings of $30,504 and $27,257 in 2018 and 2019, respectively.

### III.

On December 1, 2020, defendant filed a motion to terminate his alimony obligations, based on plaintiff's alleged cohabitation with her paramour, Bruce McDermott. Alternatively, defendant sought an order compelling plaintiff to provide discovery and for the trial court to conduct a plenary hearing on the cohabitation issue. Defendant also moved to modify or terminate his alimony obligation based on his reduced wages. Additionally, he requested an order directing the parties to exchange discovery and submit to a plenary hearing to address the amount plaintiff should reimburse him for payments he advanced for their son to attend Cornell University between 2010 and 2014.

Plaintiff opposed the motion and cross-moved for other relief unrelated to the issues on appeal. She certified she had an "off and on dating relationship" with McDermott but was not cohabiting with him. She added she had "no interest in another relationship akin to or actually like marriage." Further,

5

plaintiff certified she and McDermott spent "time together at each other's home, including overnights, . . . typically no more than one, and sometimes, two a week, most commonly on the weekend, as [their] schedules and desire permit[ted]." While plaintiff did not dispute the couple vacationed together and posted pictures of themselves on social media, she stated:

> Each of us have our own homes and primarily reside there independent of the other. Neither of us, for example, receive mail or keep wardrobes at the other's home. We do not share economics, either by way of contributing toward the other's expenses, sharing joint bank or financial accounts, loaning the other money, or supporting the other in any way. We do not do "chores" for the other. We certainly enjoy spending time with and are fond of each other, but we are not in a mutually supportive, intimate personal relationship in which we have undertaken duties and privileges commonly associated with marriage, and defendant offers no evidence of this.

Regarding defendant's request for reimbursement for a portion of their son's college expenses, plaintiff certified the parties typically reconciled what each paid for the children's college costs "one year at a time," but "[h]istorically, there was a long delay between when [she] emailed defendant [her] expenses, and when he would respond." Plaintiff stated that in 2017, after calculating what she believed defendant owed her for various expenses, she wrote him a check

A-1624-20

for $12,061.51, representing "what [she] thought [the parties] determined was [her] reasonable share" of outstanding college expenses.

Defendant objected to plaintiff's calculations, so the parties attended mediation to address the college reimbursement issue. Plaintiff certified she disclosed her financial circumstances to the mediator, but "defendant refused to disclose any of his economic circumstances, including the settlement he received from his former employer"; thus, she claimed "mediation was a total waste of time." Plaintiff further argued defendant "should not be permitted . . . to so belatedly raise this issue."

On January 8, 2021, after hearing argument, the motion judge denied without prejudice defendant's motion to terminate alimony and his request for reimbursement of plaintiff's pro rata share of their son's college expenses. The judge also denied defendant's requests for the exchange of discovery or a plenary hearing and denied his alternative request to modify or terminate alimony based on his reduced wages.

In the judge's comprehensive written opinion, he acknowledged the length and nature of plaintiff's relationship with her paramour, but ultimately found defendant failed to make a prima facie showing of cohabitation. Still, the judge acknowledged defendant could renew his application "at a later date if the facts

7

change."  Citing the seven factors listed under N.J.S.A. 2A:34-23(n),[3] albeit without referring directly to the statute's conclusory paragraph, the judge explained:

---

[3]  The factors set forth under N.J.S.A. 2A:34-23(n) are as follows:

> (1) Intertwined finances such as joint bank accounts and other joint holdings or liabilities;
>
> (2) Sharing or joint responsibility for living expenses;
>
> (3) Recognition of the relationship in the couple's social and family circle;
>
> (4) Living together, the frequency of contact, the duration of the relationship, and other indicia of a mutually supportive intimate personal relationship;
>
> (5) Sharing household chores;
>
> (6) Whether the recipient of alimony has received an enforceable promise of support from another person within the meaning of subsection h. of [N.J.S.A.] 25:1-5; and
>
> (7) All other relevant evidence.
>
> In evaluating whether cohabitation is occurring and whether alimony should be suspended or terminated, the court shall also consider the length of the relationship.  A court may not find an absence of cohabitation solely on grounds that the couple does not live together on a full-time basis.

The evidence provided by defendant indicates that plaintiff and Mr. McDermott see each other frequently, that their relationship is recognized by plaintiff's and Mr. McDermott's respective social circles, that plaintiff and Mr. McDermott may occasionally have independent access to enter the home of the other, that plaintiff and Mr. McDermott vacation together, and that the parties' children have a close relationship with Mr. McDermott and frequently spend time with plaintiff and Mr. McDermott. Taken together, these are the hallmarks that Mr. McDermott is plaintiff's long-term romantic partner, but the evidence provided does not suggest that their relationship is marriage-like or that they mutually support each other financially or otherwise. The court recognizes that it may be difficult to obtain definitive evidence to support a prima face case of cohabitation, but consistent with Landau,[4] it is not the role of the court to make it easier.

Regarding defendant's request to modify or terminate alimony based on his reduced earnings, the judge cited Larbig v. Larbig, 384 N.J. Super. 17, 23 (App. Div. 2006), for the principle there is "no brightline rule by which to measure when a changed circumstance has endured long enough to warrant a modification." Further, the judge cited Caplan v. Caplan, 364 N.J. Super. 68 (App. Div. 2003) and other cases to highlight a person's earning capacity is properly considered when assessing the reasonableness of an alimony award. Additionally, the judge considered defendant's financial circumstances from

---

[4] Landau v. Landau, 461 N.J. Super. 107 (App. Div. 2019).

9      A-1624-20

2006, his 2020 Case Information Statement (CIS), and his reported earnings from 2013 to 2019, before concluding defendant failed to demonstrate "a prima facie change in circumstances" to warrant a modification of his alimony obligation. The judge reasoned:

> At the time of the divorce, defendant was attributed $162,600.00 gross income for the purpose of calculating the base alimony amount of $5,417 per month. Further, defendant was ordered to pay additional alimony of fifty percent of the first $100,000 of his annual key manager bonus. <u>The court recognizes that defendant's high earnings at the time of divorce were the result of seniority in the company and that defendant may not find a comparable position with the same pay, however, defendant is financially comfortable and capable of . . . continuing to pay base alimony even with the loss of that job</u>. Defendant's [2020] CIS reports that, while his gross earned income <u>in 2019</u> was only $31,855, <u>his total net income was $145,386. This is more money than a person making $162,600 today would take home after taxes. Additionally, defendant discloses assets totaling $5,049,817 with only $278,985 in liabilities</u>, and that his average gross income between 2013 and 2016 before losing his job was $499,000 (though his $967,000 income in 2015 was an outlier). In sum, there has not been a substantial change in circumstances since the divorce such that downward modification of defendant's alimony obligation is warranted.
>
> [(Emphasis added).]

Finally, the judge denied defendant's request for discovery and a hearing to determine how much plaintiff should reimburse defendant to offset what he paid for the college expenses of the parties' son. The judge concluded:

> The PSA did not state with specificity how the parties were to share the cost, only that this should be proportional to their respective abilities. [The parties' son] graduated from Cornell in 2014 and the parties' attempt at mediation in 2017 failed. Consistent with the language of the PSA, this court would have to consider the income, assets, and liabilities of the parties from when [their son] attended Cornell between 2010 and 2014 to determine what their respective obligations would have been. Defendant has not provided a CIS from this time period or the information that was provided to [the parties' mediator] in order to determine if plaintiff's obligation would have been more than what she already paid based on the financial circumstances of the parties during that time period.

## IV.

On appeal, defendant raises the following contentions for our consideration:

> POINT I. DEFENDANT MADE A PRIMA FACIE SHOWING OF COHABITATION, WHICH REQUIRED THE TRIAL COURT TO ORDER DISCOVERY AND SCHEDULE A PLENARY HEARING ON THE MERITS OF DEFENDANT'S CLAIM.
>
> POINT II. THE TRIAL COURT APPLIED THE WRONG LEGAL STANDARD WHEN IT DENIED DEFENDANT'S MOTION TO MODIFY ALIMONY.

11

A. Defendant's request to modify alimony should have been analyzed by applying the factors set forth in N.J.S.A. 2A:34-23(k).

   i. The Legislature intended that the 2014 amendments to N.J.S.A. 2A:34-23(k) would apply retroactively, except in cases where its retroactive application would change an agreed-upon provision within a settlement agreement or the terms of a final judgment.

B. The trial court did not assess the reasonableness of defendant's career change in accordance with Storey v. Storey.[5]

C. The trial court erred when it determined, citing Larbig v. Larbig, that defendant did not demonstrate a prima facie change in circumstances.

POINT III. DISCOVERY AND A PLENARY HEARING SHOULD HAVE BEEN ORDERED TO RESOLVE THE RETROACTIVE APPORTIONMENT OF THE PARTIES' RESPECTIVE COLLEGE CONTRIBUTION OBLIGATIONS, IN ACCORDANCE WITH THEIR PSA.

These arguments are unavailing.

We accord "great deference to discretionary decisions of Family Part judges," Milne v. Goldenberg, 428 N.J. Super. 184, 197 (App. Div. 2012) (citing

---

[5] 373 N.J. Super. 464 (App. Div. 2004).

Donnelly v. Donnelly, 405 N.J. Super. 117, 127 (App. Div. 2009)), in recognition of the "family courts' special jurisdiction and expertise in family matters," N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (quoting Cesare v. Cesare, 154 N.J. 394, 413 (1998)).  However, questions of law determined by the trial court require our de novo review.  Avelino-Catabran v. Catabran, 445 N.J. Super. 574, 587 (App. Div. 2016) (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)); see also Reese v. Weis, 430 N.J. Super. 552, 568 (App. Div. 2013) (stating a statutory interpretation question is a legal issue subject to our plenary review).

"Agreements between separated spouses executed voluntarily and understandingly for the purpose of settling the issue of [alimony and child support] are specifically enforceable, but only to the extent that they are just and equitable."  Quinn v. Quinn, 225 N.J. 34, 48 (2016) (alterations in original) (quoting Berkowitz v. Berkowitz, 55 N.J. 564, 569 (1970)).  Thus, a court can modify a support agreement where there is a showing of changed circumstances.  Id. at 49; see also Lepis v. Lepis, 83 N.J. 139, 146 (1980).

"Whether an alimony obligation should be modified based upon a claim of changed circumstances rests within a Family Part judge's sound discretion."  Larbig, 384 N.J. Super. at 21 (citations omitted).  Each individual

13

motion for modification is particularized to the facts of that case, and "the appellate court must give due recognition to the wide discretion which our law rightly affords to the trial judges who deal with these matters." Ibid. (quoting Martindell v. Martindell, 21 N.J. 341, 355 (1956)).

As we have previously observed, the familiar change of circumstances standard established in Lepis applies to "a motion to suspend or terminate alimony based on cohabitation following the 2014 amendments to the alimony statute, N.J.S.A. 2A:34-23(n)." Landau, 461 N.J. Super. at 108. Accordingly, the

> Lepis paradigm requiring the party seeking modification to establish "[a] prima facie showing of changed circumstances . . . before a court will order discovery of an ex-spouse's financial status," continues to strike a fair and workable balance between the parties' competing interests, which was not altered by the 2014 amendments to the alimony statute.
>
> [Id. at 118-19 (quoting Lepis, 83 N.J. at 157).]

The 2014 amendments defined cohabitation as "involv[ing] a mutually supportive, intimate personal relationship in which a couple has undertaken duties and privileges that are commonly associated with marriage or civil union but does not necessarily maintain a single common household." N.J.S.A. 2A:34-23(n). Of course, at the time the parties executed their PSA and well prior to

14

the Legislature's adoption of the 2014 amendments, the legal criteria for cohabitation were not specified by statute but instead embodied in case law. See, e.g., Konzelman v. Konzelman, 158 N.J. 185, 195-203 (1999).

As the Court explained in Konzelman, cohabitation is typified by the existence of a marriage-like relationship "shown to have stability, permanency[,] and mutual interdependence." Id. at 202. "A mere romantic, casual[,] or social relationship is not sufficient to justify the enforcement of a settlement agreement provision terminating alimony[,]" nor is simply sharing "a common residence, although that is an important factor. Cohabitation involves an intimate relationship in which the couple has undertaken duties and privileges that are commonly associated with marriage." Ibid. Therefore, "a romantic relationship between an alimony recipient and another, characterized by regular meetings, participation in mutually appreciated activities, and some overnight stays in the home of one or the other, [does not] rise[] to the level of cohabitation." Quinn, 225 N.J. at 54.

It is well established the party seeking modification of alimony bears the burden of establishing "[a] prima facie showing of changed circumstances . . . before a court will order discovery of an ex-spouse's financial status." Landau, 461 N.J. Super. at 118 (alteration in original) (quoting Lepis, 83 N.J. at 157).

15

But as we recently held, even where N.J.S.A. 2A:34-23(n) applies, evidence of all seven factors enumerated in the statute is not required for the moving party "to establish a prima facie [showing] of cohabitation." Temple v. Temple, 468 N.J. Super. 364, 370 (App. Div. 2021). Nor does the statute contain all factors the trial court may consider when reviewing whether cohabitation exists. See ibid. ("[T]he statute does not contain the alpha and omega of what ultimately [may] persuade a court that a[n] [ex-]spouse is cohabiting.").

The party alleging cohabitation is "entitled to an assumption of the truth of his [or her] allegations and the benefit of all reasonable inferences to be drawn from the evidence . . . marshaled." Id. at 368. However, conclusory allegations will be disregarded. Lepis, 83 N.J. at 159. Therefore, a judge "should be careful not to permit a fishing expedition into a supported spouse's private affairs on a weak claim." Temple, 468 N.J. Super. at 375.

Although it may be difficult for a movant to establish a prima facie showing of cohabitation, Landau, 461 N.J. Super. at 118 (citing Konzelman, 158 N.J. at 191-92), absent that showing, there is no justification for the "invasion of [the ex-spouse's] privacy," ibid.; see also Quinn, 225 N.J. at 54-55 ("There are few exercises more intrusive than . . . an inquiry [which] reveals a vast amount of personal information about the daily life of the [dependent] spouse

16

that is of no concern to the [supporting] spouse."). Indeed, discovery from an alimony recipient is only warranted "[w]hen the facts support no conclusion other than that the [obligee's] relationship has all the hallmarks of a marriage." Quinn, 225 N.J. at 54.

Following our careful review of the record, and guided by these principles, we are convinced the judge did not abuse his discretion in denying defendant's motion to terminate alimony on the basis of plaintiff's alleged cohabitation. As the judge noted, the evidence defendant produced was, at best, indicative of "a serious committed dating relationship," which plaintiff acknowledged. Recognizing McDermott and plaintiff spent time at each other's homes, including overnight stays,[6] the judge appeared to accept defendant's representation that during the forty-four days non-consecutive day in 2019 and 2020 when the couple was surveilled by an investigator, the pair "spent the night together for more than half of the days observed." But defendant provided no evidence to counter plaintiff's assertion there was no financial entanglement between the two and that McDermott maintained his own residence. The record

---

[6] Defendant's investigative report, which was not certified by a named investigator, reflected the overnight stays frequently occurred on weekends.

A-1624-20

also was devoid of evidence McDermott made any enforceable promise of support to plaintiff.

Therefore, the proofs defendant provided to the judge regarding plaintiff's alleged cohabitation were far less significant than those submitted by the moving party in Temple, where we held it was error to decide a motion to terminate alimony without discovery and an evidentiary hearing. 468 N.J. Super. at 371-77. In that case, the supported former spouse was in a romantic relationship for approximately fourteen years. Id. at 367. Also, an "investigation produced considerable evidence of cohabitation or perhaps even a marriage." Id. at 372. Such evidence included numerous social media posts over a period of seven years in which the partner of the former spouse referred to her as "my wife" when describing vacations and restaurant outings they took together. Ibid. Other social media posts indicated the couple "traveled and participated in events extensively" and were often "together for holidays and family functions . . . ." Id. at 373.

Moreover, the record in Temple indicated the former spouse had sold the marital home and purchased a residence in New York City, near the workplace of her partner, who later posted that he "gave up" his New York City apartment. Id. at 373-74. Additionally, surveillance revealed the former spouse

was living full-time at her partner's New Jersey home for three months, where she was photographed engaging in household chores, retrieving and opening mail, purchasing groceries, and using a key to enter the home. Id. at 374. Further, a publication by a church near the New Jersey home identified the former spouse by her partner's surname. Id. at 373.

Accordingly, considering the paucity of defendant's proofs relative to plaintiff's purported cohabitation, and mindful the judge accepted the veracity of defendant's allegations about the nature of plaintiff's relationship with McDermott, we perceive no reason to second-guess the judge's denial of defendant's request to terminate alimony based on plaintiff's alleged cohabitation. Additionally, because defendant failed to establish a prima facie showing of cohabitation, he was not entitled to discovery or a plenary hearing. Landau, 461 N.J. Super. at 119 (citing Lepis, 83 N.J. at 157).

Regarding defendant's Point II arguments, we also are not persuaded the judge: (1) utilized "the wrong legal standard" when denying defendant's motion to modify alimony based on his reduced earnings; (2) failed to properly "assess the reasonableness of [d]efendant's career change"; or (3) erred in finding defendant did not demonstrate a prima facie case of changed circumstances.

19

As we have discussed, a judge's decision regarding the modification or termination of alimony is reviewed for an abuse of discretion, Larbig, 384 N.J. Super. at 23, and a party seeking modification of a prior alimony award bears the burden of showing a prima facie case of changed circumstances, Lepis, 83 N.J. at 157. Further, "every motion to modify an alimony obligation 'rests upon its own particular footing.'" Larbig, 384 N.J. Super. at 21 (quoting Martindell, 21 N.J. at 355).

To determine whether there is a prima facie showing of changed circumstances, the court must consider the terms of the order at issue and compare the facts as they existed when the order was entered with the facts at the time of the motion. See Faucett v. Vasquez, 411 N.J. Super. 108, 129 (App. Div. 2009). Although an "increase or decrease in the supporting spouse's income" is a recognized "changed circumstance," Lepis, 83 N.J. at 151 (citing Martindell, 21 N.J. at 355), current earnings have never been viewed as "the sole criterion [upon which] to establish a party's obligation for support," Weitzman v. Weitzman, 228 N.J. Super. 346, 354 (App. Div. 1988). Instead, "a court 'has every right to appraise realistically [a spouse's] potential earning power.'" Ibid. (alteration in original) (quoting Mowery v. Mowery, 38 N.J. Super. 92, 102 (App. Div. 1955)).

A court also is free to assess a supporting spouse's unearned income from "[r]eal property, capital assets, investment portfolio[s], and [his or her] capacity to earn by diligent attention to . . . business . . . in the determination of alimony modification." Miller v. Miller, 160 N.J. 408, 420-21 (1999) (internal quotation marks and citations omitted). Additionally, a court should consider whether an obligor seeking to modify alimony on the basis of reduced earnings has demonstrated the reduction is of a permanent nature, Lepis, 83 N.J. at 151, and affects his or her ability to pay support. See Miller, 160 N.J. at 420 (holding when an obligor seeks a termination of alimony, "the central issue is the supporting spouse's ability to pay").

Moreover, where a payor has suffered a reduction in income, that person generally must "demonstrate how he or she has attempted to improve the diminishing circumstances." Donnelly, 405 N.J. Super. at 130 n.5. If a payor continues to live lavishly, a showing of substantial change in circumstances is unlikely. Id. at 130-31.

Here, despite defendant's employment setbacks, the judge determined he received net income of $145,386 in 2019, a figure that exceeded what "a person making $162,000 today would take home after taxes." The $162,000 figure, of course, was a reference to the base level of income defendant enjoyed in 2006

when he agreed to pay plaintiff alimony of $5,417 per month. Further, the judge found defendant's 2020 CIS showed he managed to accumulate assets worth over $5,000,000 by 2020, "with only $278,985 in liabilities."

We also note defendant's 2006 CIS reflected an overall monthly budget at the time of final hearing of $5,975, a sum which included a $1,000 monthly contribution toward his children's college funds. Yet with both children now emancipated, defendant's 2020 CIS showed his total monthly budget, excluding alimony payments, was $11,709 per month. Also, a comparison of defendant's net worth from the time of final hearing to the present — based on his 2006 and 2020 CISs — showed his net worth jumped from $820,526 to just slightly under $5,000,000.

Due to defendant's failure to demonstrate he: was unable to pay alimony at the level set forth in the PSA; had cut back on his monthly expenses, rather than almost double them after 2006; or attempted "to improve [his] diminishing circumstances" after accepting a job with Equitable, Donnelly, 405 N.J. Super. at 130 n.5, 131, we agree with the judge's finding defendant did not establish a prima facie case of changed circumstances to warrant a reduction in alimony.

We need not discuss at length defendant's argument that his modification request "should have been analyzed by applying the factors set forth in N.J.S.A.

22

2A:34-23(k)."  Because the parties entered into the PSA well before the effective

date of N.J.S.A. 2A:34-23(k), i.e., September 10, 2014, we are convinced the

judge correctly declined to analyze defendant's modification request under

N.J.S.A. 2A:34-23(k).  See Spangenberg v. Kolakowski, 442 N.J. Super. 529,

538-39 (App. Div. 2015).[7]

Defendant next argues the judge erred in failing to "assess the

reasonableness of [d]efendant's career change, in accordance with Storey v.

Storey."  Again, we disagree.

Consistent with Storey, an obligor who has "selected a new, less lucrative

career must establish that the benefits he or she derives from the career change

substantially outweigh the disadvantage to the supported spouse."  373 N.J.

---

[7]  Although the 2014 amendments are to be prospectively applied, we note neither party formally challenged the judge's reference to the statutory factors under N.J.S.A. 2A:34-23(n) when he analyzed defendant's cohabitation argument; thus, we do not consider this issue.  See State v. Robinson, 200 N.J. 1, 19 (2009) ("Appellate review is not limitless.  The jurisdiction of appellate courts rightly is bounded by the proofs and objections critically explored on the record before the trial court by the parties themselves."); see also Zaman v. Felton, 219 N.J. 199, 226-27 (2014).  Even if we were to address this issue, we would not consider the judge's reference to the statute plain error, Rule 2:10-2, because as we have noted, N.J.S.A. 2A:34-23(n) "essentially adopted the definition of cohabitation the Court endorsed in Konzelman," a case that predated the parties' PSA.  Landau, 461 N.J. Super. at 117 n.8.  Moreover, we are satisfied the judge considered the totality of the parties' circumstances consonant with case law that predated the 2014 statute.

A-1624-20

Super. at 468. "The burden of persuasion is on the obligor." Id. at 469. Further, an "obligor must establish he or she is earning at capacity, i.e., not underemployed, in order to avoid imputation" of income. Id. at 474.

Here, defendant did not demonstrate the benefits of his career change substantially outweighed the disadvantages to plaintiff, or that he continued to seek employment consistent with his training and experience after he accepted a position with Equitable. But more importantly, although defendant was earning only slightly above a minimum wage level in the two years preceding his modification motion, the judge imputed no income to defendant. Instead, after comparing defendant's financial circumstances from 2006 and 2020, the judge merely found defendant was still able to satisfy his existing alimony obligations, notwithstanding his reduced earnings. Thus, regardless of the reasonableness of defendant's decision to remain at Equitable, the judge opted not to impute income to defendant based upon an implicit finding such an imputation was unnecessary.

Finally, regarding defendant's Point III argument, we are satisfied the judge did not abuse his discretion when denying without prejudice defendant's request for discovery and a plenary hearing to determine each parties' responsibility for their son's prior college expenses. Indeed, we agree with the

24

judge that because defendant failed to provide proof of his financial circumstances for the period his son attended Cornell University, this relief was not warranted. Notably, defendant offered no explanation for failing to submit this critical information to the judge, despite the PSA providing that if a shortfall existed after the children applied for scholarships, grants and loans, and educational accounts were exhausted, the parties would contribute to their children's college expenses "in proportion to their ability to pay at that time after giving consideration to income, alimony paid and received, assets and liabilities." (Emphasis added).

In sum, we perceive no basis to disturb the January 8 order. To the extent we have not addressed defendant's remaining arguments, they lack sufficient merit to warrant any further discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-1624-20