**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3500-21

J.Z.,[1]

    Plaintiff-Respondent,

v.

Y.C.L.,

    Defendant-Appellant.

_____

Submitted January 30, 2024 – Decided September 10, 2024

Before Judges Gooden Brown and Puglisi.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Morris County, Docket No. FM-14-1106-14.

Y.C.L., appellant pro se.

J.Z., respondent pro se.

PER CURIAM

---

[1] We use initials to protect the privacy of the parties in accordance with Rule 1:38-3(d)(1).

Defendant/ex-wife appeals from provisions of a May 26, 2022, dual final judgment of divorce (DJOD) pertaining to equitable distribution, alimony, retroactive pendente lite support, and maintenance of a life insurance policy to secure payment obligations. We affirm.

I.

We glean these facts from the evidence presented at the six-day bench trial that commenced on March 20, 2019, and concluded on October 28, 2021. Both parties testified during the trial.

Plaintiff/ex-husband and defendant were married on March 14, 1998. When the trial began, plaintiff was fifty-three years old, and defendant was fifty-four years old. Plaintiff had been a police officer with the City of Clifton since 1996, and defendant had been a practicing attorney in private practice. By 2004, defendant had given birth to the parties' first son, and the couple began fostering a second boy whom they later adopted in 2006.

In 2004, defendant left private practice and began working at the Office of Foreclosure. However, within a few months, defendant suffered a medical episode that resulted in an extended leave and her eventual termination. As a result, defendant began collecting monthly disability payments of $3,750 under a private MetLife insurance policy that was payable until 2029 when she turned

2

sixty-five. Eventually, defendant also applied for Social Security disability benefits and received an award in 2007 of about $1,760 per month, retroactive to December 2005, with a retroactive lump sum child benefit for each child of $40,913 and $34,634.

Around Thanksgiving 2005, the parties separated when defendant asked plaintiff to move out of the marital residence and plaintiff began living with his brother. Defendant became the primary caretaker of the children during the week, sending the children to school where she lived, while plaintiff saw the children on weekends. Both parties continued to share expenses, including vacations with the children.

In 2006, plaintiff filed a complaint for divorce. However, he withdrew the complaint after defendant convinced him that it would be financially advantageous to maintain the marriage considering taxes, health insurance, and defendant's ability to take the survivor benefit under plaintiff's Police and Firemen's Retirement System (PFRS) pension.

In 2007, plaintiff was injured on the job while responding to an automobile incident involving a semi-incapacitated driver. During the incident, the driver accelerated toward plaintiff, injuring plaintiff's shoulder. Plaintiff responded by firing his weapon and injuring the driver. As a result, plaintiff

3

suffered both physical and mental injuries and was approved for monthly PFRS accidental disability retirement benefits beginning in December 2008. Plaintiff also received a $100,000 personal injury settlement from the vehicle driver, plus $124,203 from the parties' uninsured/underinsured motorist automobile policy, less fees and costs.

With his pension in pay status, plaintiff, who had an undergraduate degree and an MBA prior to the marriage, went back to school to pursue a nursing degree. After obtaining his teaching certification and teaching high school business classes, plaintiff eventually earned a master's degree in nursing science and started working as a nurse in 2013.

On March 19, 2014, plaintiff filed a new complaint for divorce. After defendant filed an answer and counterclaim, the parties entered a consent order on November 30, 2015, resolving custody and parenting time issues and leaving the remaining financial issues for resolution at trial. On July 20, 2016, a pendente lite order temporarily directed plaintiff to pay defendant fifty percent of his PFRS disability pension subject to equitable distribution pursuant to Sternesky v. Salcie-Sternesky, 396 N.J. Super. 290 (App. Div. 2007). All Pro QDRO, an expert evaluator, determined that defendant's monthly share of the pension benefit was $1,125. The pendente lite order also denied defendant's

request for child support, citing "the similar incomes of the parties and the split custody arrangement," and denied spousal support due to the "general parity of [the parties'] monthly incomes."

The parties' remaining financial issues primarily involved their development and sale of multiple properties acquired over the course of the marriage, often using the proceeds from one property to fund the purchase of another. Even prior to the parties' marriage, plaintiff had owned a home with his two sisters located on East Shore Road in Denville. After the marriage, defendant moved into plaintiff's house with his one younger sister who continued residing in a basement apartment. The same year, the parties purchased a two-family home and an empty lot, both located on Thompson Avenue in Dover. The purchases initiated the long chain of property acquisitions over the ensuing years. Plaintiff worked to develop the properties, while defendant handled the legal work for the transactions.

In August 1999, plaintiff mortgaged the Thompson Avenue empty lot for $80,000 to build a family home on the property. In 2000, the parties purchased three properties on Woodland Avenue in Denville. In 2001, the parties remortgaged the East Shore Road home, purchasing both of plaintiff's sisters' shares in the property and recording title in both plaintiff's and defendant's

names. The parties used a portion of the mortgage proceeds to pay off defendant's student loans that had been incurred prior to the marriage. By then, the parties' first son was born.

In 2002, the parties took out a second mortgage on the East Shore Road home to fund the development of the Woodland Avenue properties. In April 2003, the parties sold the East Shore Road home for $285,000 and used a portion of the proceeds, in addition to a new mortgage and joint-checking account monies, to purchase their new marital home located on Lockley Court in Mountain Lakes. Defendant described the Lockley Court home as "the house of [her] dreams." In August 2004, the parties sold the two-family Thompson Avenue property and split the proceeds.

By then, the parties had become foster parents and hired a nanny to take care of the children and their home. They later received monthly payments from the State for the adoption. After defendant's medical episode, she became the primary caretaker of the children while plaintiff continued to develop the investment properties and maintain his employment. In July 2005, the parties sold the Lockley Court home and moved into an apartment located on Gates Court in Morris Plains. They netted approximately $256,000 from the Lockley

Court sale, which the parties used to deposit about $99,302 into plaintiff's bank account and about $157,533 into the parties' joint bank account.

According to plaintiff, his share of the proceeds together with proceeds from the Thompson Avenue sale were used to develop a modular home on one of the Woodland Avenue properties. In October 2005, plaintiff mortgaged the subject Woodland Avenue property for approximately $293,500 to continue improving the Woodland Avenue properties. The parties had already invested about $487,128 in the property. Because of her discomfort with the continued investment of funds into the Woodland Avenue property, defendant deposited "the remaining $100,000 from [the parties'] joint checking account" into "[her] checking account."

After the parties separated in late 2005, plaintiff deposited $1,200 per month into the parties' joint checking account, from which defendant paid joint expenses. The parties also kept a joint auto insurance policy for financial reasons until 2015. Defendant continued to live at the Gates Court apartment and plaintiff lived with his brother while working on the Woodland Avenue property. By October 2008, defendant withdrew from the parties' real estate investment decisions. Plaintiff sold the last of the Woodland Avenue properties in August 2010 and used the proceeds for a downpayment on a rental property

7

located on Washington Street in Boonton. Defendant maintained that she was unaware of the Washington Street transaction until the divorce proceedings.

In December 2010, plaintiff and his father purchased a property in Tarpon Springs, Florida, and rented it to plaintiff's niece and nephew. Plaintiff later received $27,500 for the Florida property, netting a $2,500 profit on his initial $25,000 contribution to the investment. In January 2013, defendant bought a home located on Edgefield Drive in Morris Plains for $370,642. The funds for the purchase came from personal investment funds, the Social Security Disability Insurance (SSDI) child benefit she received, and a $288,000 mortgage. On occasion, plaintiff stayed at the Edgefield Drive home as the parties had a history of occasional cohabitation and residence swapping during their separation. In May 2013, plaintiff purchased a home on Sommerfield Avenue in Mount Tabor, using funds from his personal injury settlements and a $266,400 mortgage.

Following the bench trial, on May 26, 2022, the trial judge entered a DJOD accompanied by a comprehensive written opinion. In the written opinion, the judge assessed credibility, made detailed factual findings, and drew legal conclusions based on her application of the governing legal principles. In assessing the credibility of the parties, the judge was impressed by plaintiff's

candor but found that defendant's attempts "to discredit plaintiff" served instead "to discredit [defendant]." As a result, the judge rejected defendant's assertion "that any money received by plaintiff during the marriage was dissipated or otherwise used for non-marital purposes."

Pertinent to this appeal, in the DJOD, among other things, the judge divided plaintiff's PFRS pension benefit "equally between the parties," requiring plaintiff to pay defendant $1,125.03 per month together with arrearages of $9,000.24 "for the [eight] months for which [plaintiff] owe[d] defendant her share of [the] pension payment." Under the DJOD, all marital assets, including interests and equity in real property, were equally divided between the parties. The DJOD also required plaintiff to pay defendant "open durational alimony" in the amount of $2,000 per month "until either party dies or . . . defendant remarries." Additionally, the DJOD required plaintiff to "maintain insurance on his life with a face value of at least $250,000," naming "defendant as the sole . . . beneficiary of the death benefit" for the duration of plaintiff's alimony obligation.

In this ensuing appeal, defendant raises the following points for our consideration:

> I. THE TRIAL JUDGE COMMITTED REVERSIBLE
> ERROR IN CONCLUDING AS A MATTER OF LAW

9

THAT THE "STERNESKY FORMULA" APPLIED TO ALL PFRS DISABILITY PENSIONS.

II. THE LARRISON[2] AND STERNESKY HOLDINGS ARE BASED ON MISTAKES OF LAW [AND] FACT AND ALL PFRS DISABILITY PENSIONS SUBJECT TO EQUITABLE DISTRIBUTION SHOULD BE DECIDED UNDER THE STANDARDS SET IN KRUGER[3] AND AVALLONE.[4]

III. THE ALIMONY DETERMINATION WAS AN ABUSE OF DISCRETION AND THE TRIAL JUDGE FAILED TO CONSIDER THE CONTROLLING LEGAL PRINCIPLES AND MADE MISTAKEN FINDINGS OF FACT AND LAW.

IV. THE TRIAL JUDGE ERRED AS A MATTER OF LAW BY NOT AWARDING RETROACTIVE PENDENTE LITE SUPPORT.

V. THE TRIAL JUDGE ERRED AS A MATTER OF LAW BY INCLUDING IN EQUITABLE DISTRIBUTION FUNDS HELD IN TRUST FOR THE PARTIES' SONS.

VI. THE TRIAL JUDGE ABUSED HER DISCRETION IN NOT ORDERING [PLAINTIFF] TO PAY THE EXISTING LIFE INSURANCE POLICY.

---

[2] Larrison v. Larrison, 392 N.J. Super. 1 (App. Div. 2007).

[3] Kruger v. Kruger, 73 N.J. 464 (1977)

[4] Avallone v. Avallone, 275 N.J. Super. 575 (App. Div. 1994)

Our standard of review of a Family Part judge's determinations following a bench trial are well-settled. We defer to a trial judge's factual findings "when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998) (citing Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 484 (1974)). "Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Id. at 412 (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). As such, we will "not weigh the evidence, assess the credibility of witnesses, or make conclusions about the evidence." M.G. v. S.M., 457 N.J. Super. 286, 293 (App. Div. 2018) (quoting Mountain Hill, LLC v. Twp. of Middletown, 399 N.J. Super. 486, 498 (App. Div. 2008)). However, "legal conclusions, and the application of those conclusions to the facts, are subject to our plenary review." Reese v. Weis, 430 N.J. Super. 552, 568 (App. Div. 2013).

Still, the Family Part has "special jurisdiction and expertise in family matters," which often requires the exercise of reasoned discretion. Cesare, 154 N.J. at 413. Family Part judges have broad discretion to allocate assets subject to equitable distribution, Clark v. Clark, 429 N.J. Super. 61, 71 (App. Div. 2012), make alimony determinations, Martindell v. Martindell, 21 N.J. 341, 355

11

(1956), and decide income imputations, <u>Storey v. Storey</u>, 373 N.J. Super. 464, 474-75 (App. Div. 2004). If we conclude there is satisfactory evidentiary support for the trial judge's findings, our "task is complete" and we will not disturb the result. <u>Beck v. Beck</u>, 86 N.J. 480, 496 (1981) (quoting <u>State v. Johnson</u>, 42 N.J. 146, 162 (1964)).

Applying these principles, we will not disturb the judge's rulings, and affirm substantially for the reasons stated by the judge in her well-reasoned written decision. Defendant argues the judge misapplied the formula for equitable distribution of a pensioner spouse's accidental disability pension benefit established in <u>Sternesky</u>. Specifically, she asserts the <u>Sternesky</u> court did not intend the formula to be employed to exempt the entire PFRS disability pension from equitable distribution absent "diminished earning capacity, pain, suffering, or disability." Instead, defendant claims that the entirety of plaintiff's pension is subject to equitable distribution because he did not satisfactorily provide evidence to support his claim that the entire award was exempt.

The law governing equitable distribution of a pension in this State is clear:

> The party seeking exemption from equitable distribution bears the burden of proof. <u>Landwehr v. Landwehr</u>, 111 N.J. 491, 504 (1988). Ordinarily, the "portion of a pension legally or beneficially acquired by either party during marital coverture is subject to equitable distribution." <u>Claffey v. Claffey</u>, 360 N.J.

Super. 240, 255 (App. Div. 2003) (citing Kikkert v.
Kikkert, 88 N.J. 4, 5 (1981)).
[Larrison v. Larrison, 392 N.J. Super. 1, 13-14 (App.
Div. 2007).]

To fairly determine the portion of a pension acquired during marital coverture, we established the "coverture fraction" as "the appropriate tool to utilize in attempting to determine an appropriate allocation of spouses' respective interests in a pension." Faulkner v. Faulkner, 361 N.J. Super. 158, 165 (App. Div. 2003).

> "The coverture fraction is the proportion of years worked during the marriage to total number of years worked." Eisenhardt v. Eisenhardt, 325 N.J. Super. 576, 580 (App. Div. 1999). The numerator of the fraction is the period during the marriage in which the employed spouse participates in the pension plan and the denominator of the fraction is the total period of time in which the spouse participates in the plan.
>
> [Id. at 165-66.]

But not all pensions are equal. We have long recognized a distinction in equitable distribution of pensions based on whether its purpose serves as a retirement benefit, a payment to alleviate the effects of a disability, or both. See Avallone , 275 N.J. Super. at 581-83 (discussing the case law of other states that "have also recognized the multiple functions served by a disability pension" and holding "in light of the unique nature of a disability pension" that "a number of

factors . . . should be taken into consideration before settling on a final distributable amount").

Regarding disability pensions, we have specifically held "that the portion that serves to compensate . . . pensioner-spouses for [their] disability and economic loss should not be subject to equitable distribution." Larrison, 392 N.J. Super. at 16. And we have acknowledged that while "non-pensioner spouses 'should not be deprived of [their] right to participate in such a significant asset merely because it has been characterized as a disability pension rather than a retirement pension[,]'" they are "only entitled to share the 'portion of [pensioner-spouses'] disability pension[s] which represents a retirement component,' but not the 'portion which represents compensation for [pensioner-spouses'] personal disability and personal economic loss.'" Id. at 16-17 (quoting Avallone, 275 N.J. Super. at 583-84).

In Sternesky, we enunciated a methodology to equitably distribute disability pension payments. 396 N.J. Super. at 304-05. Absent "specific evidence or official guidance permitting a more precise segregation of the components of an accidental disability pension," the Sternesky formula "segregate[s] the marital portion of the allowance from the portion best viewed as compensation to the individual for the disabling injury." Id. at 305.

> In this context, the measure that reasonably recognizes the relationship between efforts during the marriage and total efforts required for return on that investment is the length of service that would have been required for an ordinary retirement allowance but for the disabling injury. Setting aside a disabling injury, the non-employee spouse's reasonable expectation, while [the employee] spouse is earning retirement credits, is no greater than a share of a retirement allowance based on service during the marriage in proportion to the years of service needed for an ordinary pension.
>
> [Id. at 303-04.]

Stated differently, "the court should identify the marital component by multiplying the ordinary retirement allowance by a fraction, with a numerator equivalent to service during the marriage and a denominator equivalent to service required for an ordinary retirement allowance." Id. at 304. "The results will recognize . . . 'non-pensioner spouse[s'] legitimate claims to a marital asset, without attaching funds intended to compensate . . . pensioner-spouse[s] for [their] disabilities.'" Ibid. (quoting Larrison, 392 N.J. Super. at 18). This formula, which provides for the parties based on "reasonable expectation[s]," has remained the standard for equitable distribution of a disability pension since its enunciation nearly two decades ago. See id. at 303.

Here, applying this standard, the judge explained:

> This is a defined benefit plan that is in pay status and has been since December 1, 2008. Plaintiff receives

15

[$5,598.22] monthly, tax free. In [p]laintiff's case this pension is a disability pension which means that it was awarded earlier than the [twenty] years of service required for a member to qualify for the retirement pension.

. . . . For the purposes of equitable distribution, it is the portion of the pension that was earned by plaintiff during the parties' marriage that was included. Painter v. Painter, 65 [N.J.] 196 [(1974)]; Innes v. Innes, 117 [N.J.] 496 (1990). Per the [Sternesky] decision, only the retirement portion of plaintiff's pension was valued, not the disability component. The lump sum value of that portion was found by [All Pro QDRO] to be $404,098, and the monthly benefit was valued at [$2,250.06]. However, the lump sum form of this asset is not available for offset as the pension is in pay status and has been paid to plaintiff for over thirteen years.

In rejecting defendant's contention that use of the Sternesky formula failed to account for plaintiff's new career "earning more than he did as a law enforcement officer," the judge stated:

The [Sternesky] opinion addresses this objection squarely:

An employee qualifies for an accidental disability retirement allowance only if, "as a direct result of a traumatic event" occurring during and resulting from performance of duties, the employee is "incapacitated" for his or her present duty or any other duty that the police or fire department is willing to assign. [N.J.S.A. 43:16A-7(1)].

Plaintiff qualified because his post-traumatic stress disorder makes him unfit to work in law enforcement or as a firefighter, as found by the pension board. That he is able to work as a nurse practitioner or teacher is not the point. His chosen profession was law enforcement, a career of public service that is highly dangerous and generally enjoys an aura of authority and respect. Our legislature has chosen to compensate those who enter this risky career, and are injured in the performance of their duty, as a matter of public policy, not a matter of earnings. For these reasons, the court finds that the Sternesky case is applicable here.

Rejecting defendant's criticism of the coverture fraction used by All Pro QDRO, the judge stated:

All Pro QDRO determined the coverture fraction to be [3,915] days/[7,305] days, or 53.59 [percent]. The concept behind the coverture fraction here is complicated by the fact that in order to qualify for the retirement pension, which is the only component of a disability pension that is subject to equitable distribution, plaintiff would have to be employed in his job for [twenty] years. Thus, while the numerator of the coverture fraction is the length of time that the parties were married and plaintiff was working, as would be the case in all coverture fraction determinations, the denominator is the length of time from plaintiff's first day on the job to a date [twenty] years later. Otherwise, there would be no component of the pension that would qualify for equitable distribution. The denominator is a necessary artificial construct, devised by the Sternesky court for these circumstances, so that a spouse of an officer injured before having [twenty] years of service can receive a share of the pension by way of equitable distribution.

A-3500-21

Both spouses typically rely on the PFRS pension for their future security. Moore v. Moore, 114 N.J. 147, 157 (1989).

The judge also rejected defendant's proposed coverture fractions, stating in-part:

> Defendant's proposed coverture fraction, amounting to 87.41[ percent], contains a denominator that represents only [twelve] years and [three] months of service, far short of the [twenty] years required for a retirement pension. That would preclude plaintiff[ from] being eligible for a retirement pension. As such, defendant would receive no part of an asset that the parties expected, rightfully, to help support them in their retirement. Clearly defendant does not intend to use a coverture fraction that deprives her of any part of plaintiff's pension.

The judge concluded, "All Pro QDRO['s] valuation follow[ed] the Sternesky formula faithfully." Thus, the judge "adopt[ed] the value of the benefit subject to equitable distribution, [$2,250.06,]" and awarded defendant half of plaintiff's monthly PFRS pension benefit, amounting to $1,125.03. Both the record and the State's settled case law amply support the judge's decision.

Defendant argues that Sternesky and its preceding case law are based on "a gross mistake of the laws governing [PFRS] disability pensions." Defendant proffers instead that Kruger and Avallone are the more appropriate standards by

which plaintiff's pension should be subjected to equitable distribution.  We disagree.

In Avallone, we noted that Kruger "is not controlling . . . for several reasons."  275 N.J. Super. at 580.  First, "[t]he disability pension at issue in Kruger was a military disability pension to which special principles apply."  Ibid.  Second, that case "was decided prior to McCarty v. McCarty, 453 U.S. 210 (1981), which reached a contrary result."  Ibid.  "Finally, as the Supreme Court noted in Landwehr, Kruger was based upon a version of our equitable distribution statute which the Legislature subsequently amended."  Id. at 580-81.

Next, defendant argues the $93,911 in SSDI child benefits she received as "the chosen 'representative payee'" were "exempt from equitable distribution" as a matter of law.  Therefore, according to defendant, the Edgefield Drive home, which she paid for in part with the children's SSDI benefits, should not be equitably distributed but retained entirely by her.  In support, defendant cites 42 U.S.C. § 407, which limits the transfer or assignment of payments made under the statute.

Under 42 U.S.C. § 407,

> The right of any person to any future payment under
> this subchapter shall not be transferable or assignable,

at law or in equity, and none of the moneys paid or payable or rights existing under this subchapter shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law.

[42 U.S.C. § 407(a).]

Defendant also cites federal regulations which require a "representative payee," who receives the Social Security benefits on a beneficiary's behalf, among other things, to:

> (a) Use the benefits received on [the beneficiary's] behalf only for [the beneficiary's] use and benefit in a manner and for the purposes he or she determines, under the guidelines in this subpart, to be in [the beneficiary's] best interests;
>
> (b) Keep any benefits received on [the beneficiary's] behalf separate from [the representative payee's] own funds and show [the beneficiary's] ownership of these benefits unless [the payee] is [the beneficiary's] . . . natural or adoptive parent . . . and lives in the same household with [the beneficiary] . . . ; [and]
>
> (c) Treat any interest earned on the benefits as [the beneficiary's] property . . . .
>
> [20 C.F.R. § 404.2035(a)–(c).]

See also Wash. State Dep't of Soc. & Health Servs. v. Guardianship Est. of Keffeler, 537 U.S. 371, 376-77 (2003) (citing 20 C.F.R. § 404.2035).

20

In <u>Philpott v. Essex County Welfare Board</u>, 409 U.S. 413 (1973), the United States Supreme Court held that section 407 "imposes a broad bar against the use of any legal process to reach all social security benefits" by "all claimants, including a State." <u>Id.</u> at 417. There, the Court prohibited this State from reimbursing itself for payments made by its welfare agency, the Essex County Welfare Board, to the recipient from the recipient's future real or personal property. <u>Id.</u> at 413-14, 417. The <u>Philpott</u> Court analogized the anti-reassignment clause of 42 U.S.C. § 407 to that exempting veterans' benefits under 38 U.S.C. § 3101. <u>Id.</u> at 416-17 (citing <u>Porter v. Aetna Cas. & Sur. Co.</u>, 370 U.S. 159, 161-62 (1962)). The Court reasoned that because "the funds on deposit were readily withdrawable and retained the quality of 'moneys' within the purview of [section] 407," this State could not employ legal process to recoup its funds from the recipient's Social Security benefits. <u>Ibid.</u>

In <u>Porter</u>, a U.S. Air Force veteran "suffered a judgment at the hands of" Aetna Casualty and Surety Company, which sought attachment of "a checking account and two accounts in local federal savings and loan associations." 370 U.S. at 160. The accounts were established "with funds received from the [United States] Veterans' Administration as disability compensation" pursuant to 38 U.S.C. § 3101(a). <u>Id.</u> at 159-60. As the Court explained, it has long "been

21

the policy of the Congress to exempt veterans' benefits from creditor actions as well as from taxation." Id. at 159-60.  Citing a distinction between the holdings of Trotter v. Tennessee, 290 U.S. 354 (1933) and Lawrence v. Shaw, 300 U.S. 245 (1937), the question before the Court was whether the funds deposited in the savings and loan associations made the deposited funds "permanent investments" or "moneys" that were "subject to demand." Id. at 160-62.  Only the latter was subject to the exemption.  Id. at 161.  The Porter Court reasoned that because "the funds were subject to immediate and certain access[,]" "were not of a speculative character," and "plainly had 'the quality of moneys,'" the funds "should remain inviolate."  Id. at 161-62.

In Keffeler, the Supreme Court addressed whether a state agency receiving Social Security funds on behalf of children under its care violated section 407 when it reimbursed itself with those funds.  537 U.S. at 375.  The Court considered whether the agency employed "other legal process" in the recoupment of expenses while it was in possession of the Social Security benefits.  Id. at 383.  The Keffeler Court defined the term "other legal process" in relation to the preceding terms "execution, levy, attachment, garnishment, or other legal process" under the interpretive cannons of noscitur a sociis and ejusdem generis.  Id. at 383-84 (quoting 42 U.S.C. § 407(a)).

22

The Court concluded that

> "other legal process" should be understood to be process much like the processes of execution, levy, attachment, and garnishment, and at a minimum, would seem to require utilization of some judicial or quasi-judicial mechanism, though not necessarily an elaborate one, by which control over property passes from one person to another in order to discharge or secure discharge of an allegedly existing or anticipated liability.
>
> [Id. at 385.]

Because the state agency was in possession of the Social Security funds, the Keffeler Court held it had not employed a legal process violative of the anti-reassignment clause in section 407. Id. at 386, 392.

Furthermore, in Lamb v. Connecticut General Life Insurance Co., 643 F.2d 108 (3d Cir. 1981), the Third Circuit held that the unfrozen offset of an insured individual's private insurance policy payment by the cost-of-living increase in the individual's Social Security benefit did not violate the anti-reassignment clause of section 407. Id. at 111. Since Lamb received her full Social Security payment and did not transfer any portion to the company, and section 407 "does not address itself to the level of benefits that a private insurance program must pay to augment federal programs," the offset did not violate the federal law. Ibid.

23

Still, federal courts have held that Social Security benefits are exempt even when commingled in deposit accounts. See, e.g., S & S Diversified Servs., L.L.C. v. Taylor, 897 F. Supp. 549, 552 (D. Wyo. 1995) (holding that Social Security benefits deposited with another individual's annuity funds are "absolutely exempt"); NCNB Fin. Servs., Inc., v. Shumate, 829 F. Supp. 178, 180-81 (W.D. Va. 1993), aff'd 45 F.3d 427 (4th Cir. 1994) (concluding that reasonably traceable Social Security benefits commingled with other funds were entitled to protection).

Here, the SSDI benefits defendant received for her two children were commingled with personal funds in defendant's investment account, which was declared part of the marital property and used to purchase the Edgefield Drive home where defendant lived with the children. In addressing defendant's argument that the funds were exempt, the judge explained:

> [Defendant] believes that it should not be equitably distributed, but rather entirely retained by her, because she paid for it in part with the children's Social Security lump sum benefits received by her when she went on Social Security Disability in 2012. However, she provides no authority for that position. Additionally, the lump sum award represented the parties' children's entitlements to Social Security monthly payments retroactive to when defendant qualified for Social Security disability. As such the lump sum payments were to reimburse both parties for part of their cost of maintaining the children after defendant became

24

disabled.  Both parties contributed to the support and care of the children.  Defendant provided their home and the majority of their day-to-day needs, and plaintiff paid for half of the children's separate expenses and some of defendant's expenses.  The court must take into account the source of the funds that were used to purchase this home, in determining an equitable distribution of this asset.  However, contrary to defendant's claim, the source here, the children's Social Security benefits, neither renders the property exempt from distribution nor favors defendant over plaintiff.  In addition, defendant's argument ignores the fact that part of the purchase price came from her Oppenheimer Fund, which she admits was a marital asset.

We agree with the judge that the Edgefield Drive home is not categorically exempt from equitable distribution merely because a portion of the funds used to purchase the property were Social Security disability benefits.  We are satisfied that the funds are no longer "moneys," and the legal process—the distribution—is not directly against the Social Security benefit payment.  Cf. Philpott, 409 U.S. at 416-17; NCNB Fin. Servs., Inc., 829 F. Supp. at 180.  Using Social Security funds to purchase a home is more analogous to a "permanent investment[]" "of a speculative character" and less like a checking account. Porter, 370 U.S. at 160-62.  Further, as the judge recounted, "[t]he parties agree[d] that the value of this asset for equitable distribution purposes [was] $82,642."  Defendant also made a profit of $154,261.85 on the property from

the total proceeds of $429,000.  Therefore, even if the Social Security benefits were exempted, enough funds remained to cover the initial investment.

Next, defendant challenges the judge's application of certain alimony factors codified in N.J.S.A. 2A:34-23(b).  Specifically, defendant takes issue with the judge's assessment of the "marital standard of living," "[her] primary care of the children while [plaintiff] pursued advanced education and training," "the devastating effect of the equitable distribution determination," the denial of "retroactive [p]endente [l]ite support," and "failing to award reimbursement alimony . . . due to [defendant's] contributions to [plaintiff's] education and subsequent earnings . . . and the [p]arties' ages at the time of the alimony award."

"The basic purpose of alimony is the continuation of the standard of living enjoyed by the parties prior to their separation."  Innes, 117 N.J. at 503.  "[T]he goal of a proper alimony award is to assist the supported spouse in achieving a lifestyle that is reasonably comparable to the one enjoyed while living with the supporting spouse during the marriage."  Crews v. Crews, 164 N.J. 11, 16 (2000).  It "is neither a punishment for the payor nor a reward for the payee." Mani v. Mani, 183 N.J. 70, 80 (2005).

Pursuant to N.J.S.A. 2A:34-23, a court may order alimony "as the circumstances of the parties and the nature of the case shall render fit, reasonable

A-3500-21

and just." See Gnall v. Gnall, 222 N.J. 414, 429 (2015) (concluding alimony awards are "governed by distinct, objective standards defined by the Legislature in N.J.S.A. 2A:34-23(b)"). As such, N.J.S.A. 2A:34-23(b) enumerates the following factors for consideration:

(1) The actual need and ability of the parties to pay;

(2) The duration of the marriage or civil union;

(3) The age, physical and emotional health of the parties;

(4) The standard of living established in the marriage or civil union and the likelihood that each party can maintain a reasonably comparable standard of living, with neither party having a greater entitlement to that standard of living than the other;

(5) The earning capacities, educational levels, vocational skills, and employability of the parties;

(6) The length of absence from the job market of the party seeking maintenance;

(7) The parental responsibilities for the children;

(8) The time and expense necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment, the availability of the training and employment, and the opportunity for future acquisitions of capital assets and income;

(9) The history of the financial or non-financial contributions to the marriage or civil union by each

27

party including contributions to the care and education of the children and interruption of personal careers or educational opportunities;

(10) The equitable distribution of property ordered and any payouts on equitable distribution, directly or indirectly, out of current income, to the extent this consideration is reasonable, just and fair;

(11) The income available to either party through investment of any assets held by that party;

(12) The tax treatment and consequences to both parties of any alimony award, including the designation of all or a portion of the payment as a non-taxable payment;

(13) The nature, amount, and length of pendente lite support paid, if any; and

(14) Any other factors which the court may deem relevant.

The statute continues:

In each case where the court is asked to make an award of alimony, the court shall consider and assess evidence with respect to all relevant statutory factors. If the court determines that certain factors are more or less relevant than others, the court shall make specific written findings of fact and conclusions of law on the reasons why the court reached that conclusion. No factor shall be elevated in importance over any other factor unless the court finds otherwise, in which case the court shall make specific written findings of fact and conclusions of law in that regard.

[N.J.S.A. 2A:34-23(b).]

28

A-3500-21

"An alimony award that lacks consideration of the [above] factors . . . is inadequate . . . ." Crews, 164 N.J. at 26.

As to the fourth factor, "'[t]he standard of living during the marriage is the way the couple actually lived, whether they resorted to borrowing and parental support, . . . [or] limited themselves to their earned income,' or if they chose to accumulate savings." S.W. v. G.M., 462 N.J. Super. 522, 531 (App. Div. 2020) (alterations in original) (internal citations omitted) (first quoting Glass v. Glass, 366 N.J. Super. 357, 371 (App. Div. 2004); and then citing Lombardi v. Lombardi, 447 N.J. Super. 26, 36-37 (App. Div. 2016)). Nevertheless, the determination of the marital budget is not formulaic. Id. at 533 (citing N.J.S.A. 2A:34-23(b)).

> Contained in most marital budgets are expenses, which may not be associated with either the alimony payor or payee, including those associated with children who have since emancipated or whose expenses are met by an asset or a third-party source having no bearing on alimony. There are also circumstances where an expense is unrelated to either the payor or the payee but is met by that party on behalf of a child.
>
> [Id. at 533-34.]

In S.W., we addressed whether the trial judge properly determined the "numerical" "marital lifestyle." Id. at 530-31. There, "the judge's starting point was defendant's current budget, as opposed to the marital lifestyle." Id. at 529.

Although the judge reviewed the parties' testimony and case information statements and defendant's pendente lite budget, id. at 529, we concluded that "the trial judge disregarded the marital budget altogether and instead supplemented defendant's current budget with some expenses she once enjoyed during the marriage." Id. at 532. That methodology was "problematic because it ignored the judge's own findings that the marital lifestyle 'subsumed' the entirety of plaintiff's earnings." Id. at 532-33. We remanded the issue, instructing that "consider[ation of] the supported spouse's ability to contribute [the supported spouse's] own expenses and the amount of alimony necessary to meet the uncovered sum" may only be considered once the marital lifestyle was calculated. Id. at 534 (citing Crews, 164 N.J. at 32-33).

In determining an alimony award, the court may impute a party's income from the "usual or former occupation," "the average earnings for that occupation as reported by the New Jersey Department of Labor," or the "most recent wage or benefit record." Elrom v. Elrom, 439 N.J. Super. 424, 435 (App. Div. 2015) (quoting Child Support Guidelines, Pressler & Verniero, Current N.J. Court Rules, cmt. 12, Appendix IX–A to R. 5:6A, at 2635 (2015)) ("These legal precepts equally apply when establishing a party's obligation to pay alimony."). However, "income from pension benefits that have been treated as an asset for

equitable distribution purposes (those benefits reflecting work during the marriage partnership) is not to be considered in determining alimony." Innes, 117 N.J. at 505. The opposite is true for income from pension benefits, or portions thereof, not subject to equitable distribution. See ibid.

Here, in awarding defendant $2,000 per month in alimony, the judge separately considered each factor under N.J.S.A. 2A:23-34(b), in conjunction with the equitable distribution of the parties' property. The judge concluded "that alimony, not equitable distribution, [was] the appropriate vehicle for addressing defendant's declining income, now and in the future." The judge also supported the alimony award by determining that variable future circumstances would be more easily remedied through a modification of alimony based "upon a substantial change in . . . circumstances."

Critically, in assessing the marital lifestyle, the judge stated:

> [T]his marriage of medium duration saw an unconventional living arrangement in the latter half, but the parties remained a cohesive financial unit. They also continued their manner of sharing the care of their children, with defendant having the majority of the day-to-day care, and plaintiff helping directly with expenses and taking the children on weekends. While living apart frequently, they cooperated in their business activities until shortly before the end-date in 2014 . . . .
>
> The parties amassed the marital estate largely through their mutual industry. Each had training and

skills that well served their real estate investment business. Plaintiff went back to school and trained for a new career during the marriage, at some cost to the marital estate. Defendant's primary care of the children enabled plaintiff to work at his law enforcement career and carry on their real estate activities. Later it enabled him to return to school, work at teaching and then nursing, all while continuing the real estate development and management through the end-date of their marriage.

Plaintiff's career-ending incident caused a hiatus in their otherwise continuous success with their respective professional careers and investments. However, in a remarkably short time he recovered enough to make a plan and commence training for a new career. Although defendant suffers from an ongoing mental health disorder, there was only one week during the marriage when she was hospitalized for it. There is no evidence that it otherwise affected the parties' day to day life or her care of the children.

The parties had a very comfortable standard of living. One of the boys went to parochial school at some point. Defendant had a series of high-end cars including an Acura, a Jaguar and a Mercedes. They vacationed in Costa Rica annually for two weeks. They had the ability to own their home, although they chose to rent for several years. They owned investment real estate. Each ended up buying a high-end middle-class home by the end of the marriage. Plaintiff is in a position to sustain this standard of living on his income. Defendant cannot do so on her income.

Overall, it is the mutuality of the parties' financial success that stands out in this marriage. While they encountered devastating occurrences, they overcame them with surprising ease and carried on as a high-

functioning partnership. They each ended the marriage with comparable equity in their homes in addition to other assets.

Defendant specifically challenges the judge's assessment of the factors enumerated under N.J.S.A. 2A:34-23(b)(4), 9, 10, 13, and 14. In addressing the marital standard of living under N.J.S.A. 2A:34-23(b)(4), the judge explained:

> The parties purchased a two-family home and vacant lot in Dover, N.J.[,] shortly after they married, and leveraged that property and subsequent properties to purchase and improve nine properties, selling them at a profit. These investments, plaintiff's personal injury awards, defendant's Social Security awards for herself and the children, and their salaries . . ., enabled them to have savings, at times, over [$100,000], to have defined contribution retirement funds worth almost [$200,000], . . . and save well over [$100,000] in college education funds for their sons. . . . [Defendant] listed the marital standard of living in her June 2015 Case Information Statement as requiring [$9,734] per month.

The judge recounted the parties' respective incomes, noting that "[a]t the beginning of the marriage, defendant's earnings were greater than plaintiff's. Then when she went on disability and plaintiff lost his law enforcement career, they lived on comparable disability incomes, including defendant's SSDI, until plaintiff started earning money as a nurse in 2012." The judge pointed out that "[a]fter plaintiff's traumatic event, defendant's income, at approximately $100,000 annually from her private disability, Social Security, the children's

33

Social Security and [the] adoption subsidy, equaled or exceeded plaintiff's income, including his pension, for a few years."  Then, after "the adoption stipend . . . terminated on [the child's eighteenth] birthday," defendant's annual income "decreased from approximately $100,000 to $70,000."  The judge also considered the potential future decrease in defendant's income "upon her [sixty-fifth] birthday, when her private disability insurance contract terminates" and her income would be decreased by "$45,000 per year from that policy."  Meanwhile, according to the judge, "[p]laintiff enjoy[ed] an annual income of approximately $216,900[5] from his salary" as "a [p]sychiatric [n]urse [p]ractitioner in a correctional facility" and "will collect his PFRS pension for life."

The judge concluded that plaintiff had "enough income" to maintain the marital standard of living after the divorce.  On the other hand,

> [d]efendant has decreased her housing cost by purchasing a farm in upstate New York, but she no longer has high-end multiple cars, her ability to contribute to savings has been eliminated, and these and other discretionary spending items have been replaced by higher expenses for necessities such as healthcare and health insurance.  She was covered by [p]laintiff's ealth insurance throughout the marriage.

---

[5]  The judge's opinion identifies slightly different estimations of plaintiff's salary, ranging from $215,000 to $216,900.  At the time of the opinion, the judge identified "his current income [as] $216,880."

A-3500-21

Turning to the financial and non-financial contributions to the marriage under N.J.S.A. 2A:34-23(b)(9), the judge explained:

> Both parties participated actively in the acquisition of most of the properties, making the decisions together. Defendant performed the legal work for purchases and sales, and plaintiff was in charge of the construction of improvements. . . . Through work, earnings and disability incomes, both parties contributed substantially to the marital estate.
>
> Defendant did most of the parenting of the boys after she became disabled in 2004, and a nanny was no longer needed. When the parties lived apart, the boys lived and went to school where defendant lived. They would spend most weekends with plaintiff unless they had an activity such as sports or camping that prevented them from going to his residence. Defendant's primary responsibility for the boys enabled plaintiff to spend a lot of time during the week at construction sites on the parties' properties.

The judge further acknowledged that "[d]efendant's care of the children's basic needs during the week and her steady disability income enabled plaintiff to attain an education for a new career and launch that career."

Considering the equitable distribution of the marital assets under N.J.S.A. 2A:34-23(b)(10), the judge recounted:

> The equitable distribution of those assets that are subject to distribution will have left the parties in comparable positions. Each owns a home; plaintiff's is worth more and he has a mortgage on it. Defendant has no debt. The equity each party had in their respective

homes at the end-date of the marriage is comparable. Other assets will have been divided equally or close to it. Each party received approximately $70,000 from the proceeds of sale of their last investment property. Defendant will have to pay plaintiff for his share of . . . defendant's 401K plan, $37,426, within [ninety] days.

In addition, the judge noted that "the portion of plaintiff's PFRS pension that was not equitably distributed [was] eligible for the court to consider with respect to alimony." Finally, considering pendente lite support under N.J.S.A. 2A:34-23(b)(13), the judge acknowledged that "[n]one was ordered." The judge concluded that the "disparate picture of the parties' financial circumstances after th[e] divorce is over" compelled an award of open durational alimony to defendant "to cover her shortfall and provide some savings on an ongoing basis." The judge found "extraordinary circumstance[s]" by virtue of "defendant's disability and the [upcoming] termination of her disability income policy" sufficient to take the case out of the limitations otherwise imposed by N.J.S.A. 2A:34-23(c) (limiting "the total duration of alimony" for any marriage "less than [twenty] years in duration" "except in exceptional circumstances").

Contrary to defendant's claim, the judge employed the methodology we endorsed in S.W., 462 N.J. Super. at 531, and we discern no basis to intervene. We also reject defendant's assertion that the judge erred by failing to award

36

reimbursement alimony. This is not a case where one spouse invested more into household expenses while the other attended schooling and advanced in a profession. Cf., e.g., Lynn v. Lynn, 91 N.J. 510, 512-13, 518 (1982) (holding that an award of reimbursement alimony was warranted where the ex-wife, a research analyst, supported the household "with the expectation" that her ex-husband, a medical school student who made substantially lower contributions to the household, would have greater earning potential to benefit both spouses). Here, both spouses suffered devastating disabilities that prevented them from engaging in their chosen professions. Furthermore, while pursuing a new profession, plaintiff continuously contributed to the household expenditures.

Likewise, we reject defendant's claim that the judge erred by declining to award retroactive pendente lite support to defendant despite noting "the gross disparity between [the parties'] income . . . for . . . six years" and the current and future "drop" in defendant's income. "The State has long recognized the power of the judiciary to prevent irreparable harm and to preserve the status quo through the device of awarding temporary financial support pending a full investigation of the case." Mallamo v. Mallamo, 280 N.J. Super. 8, 11-12 (App. Div. 1995) (italicization omitted). The Legislature has specifically authorized pendente lite support awards to provide temporary financial support in pending

matrimonial litigation. Id. at 12 (citing N.J.S.A. 2A:34-23). Pendente lite support orders are subject to modification at the time final judgment is entered. Ibid. "Any changes in the initial orders rest with the trial judge's discretion." Slutsky v. Slutsky, 451 N.J. Super 332, 368 (App. Div. 2017).

In the July 20, 2016, order, the motion judge denied defendant's request for pendente lite support, citing "the period of time in which the parties have lived separate and apart, and given the general parity of their monthly incomes." At the time, the judge noted "it may ultimately be necessary to issue a spousal support award" due to defendant's future loss of "several of the benefits (derivative or otherwise) that she currently receives."

Subsequently, however, the trial judge found "no reason to order either form of support retroactively," explaining:

> Hindsight does not weigh those circumstances differently from how they were considered at that time. The alimony that the court orders now is prospective and is based on facts that exist now and in the future. Indeed, the judge who heard the [pendente lite] motion foretold the possible need for alimony in the future.

We agree with the judge's decision and discern no basis to overturn the judge's denial of retroactive pendente lite support.

Finally, defendant argues the judge abused her discretion by denying her request to order plaintiff to maintain an existing $500,000 life insurance policy,

in effect since 1999. She submits that the pension statute, as amended in 1967, "eliminat[ed] the election of a designated beneficiary in favor of a survivor benefit for the member's spouse" and that the amended statute contains no provision for a divorced spouse. Therefore, according to defendant, "no provision was made for the loss of the PFRS pension upon [plaintiff]'s death."

Plaintiff's PFRS pension is governed by N.J.S.A. 43:16A-1 to -68. N.J.S.A. 43:16A-1(24)(b), as amended, defines widow as a "woman to whom a member or retirant was married on the date of his death and who has not remarried." "Thus, to be entitled to a widow's pension, the widow must have been married to the member on the day he died and not remarried. No provision is included for divorced spouses . . . ." La Sala v. La Sala, 335 N.J. Super. 1, 8 (App. Div. 2000); see also N.J.S.A. 43:16A-12.1(a) ("Upon the death after retirement of any member of the retirement system there shall be paid to the member's [surviving spouse] a pension of [fifty percent] of final compensation for the use of [the surviving spouse], to continue [until death or remarriage] . . . .").

Separate from a survivor benefit, under N.J.S.A. 43:16A-12.3, a PFRS pension recipient may elect a beneficiary upon his or her death. Under that provision, the "designation of beneficiary by a member or retirant shall be made

in writing on a form satisfactory to the retirement system, and filed with the retirement system." Ibid. Furthermore, "[t]he provisions of this section shall be construed separately with respect to each of the death benefits for which a beneficiary is designated by the member or retirant." Ibid.

In Larrison, we reversed the trial court order requiring the pensioner-spouse to maintain life insurance to protect the non-pensioner spouse's equitably acquired share of pension benefits in the event of the pensioner-spouse's death where the pension plan did not provide for survivor benefits to an ex-spouse. 392 N.J. Super. at 18-19. We began our analysis by

> noting that "[a] deferred distribution . . . amounts to a contingency distribution dependent upon the survival of the pensioner spouse." Accordingly, if the pension does not provide survivor benefits to an ex-spouse, then [the ex-spouse's] benefits cease when defendant dies. As this court stated, "when he gets, she gets; when he dies, so does her benefit."
>
> [Id. at 18 (first alteration in original) (quoting Claffey, 360 N.J. Super. at 261).]

We reasoned that because the pensioner-spouse's "pension plan [did] not provide for survivor benefits to an ex-spouse," if the pensioner-spouse predeceased the non-pensioner spouse, then the non-pensioner spouse would "no longer receive her share of his pension benefit" and there was "no legal support for the trial court's order directing otherwise." Id. at 19.

40

Here, in her written opinion, the judge explained:

> [D]efendant should have the security of life insurance or a survivor benefit to meet defendant's needs should plaintiff predecease her. The testimony was unclear as to whether defendant will be cut off from the survivor benefit connected to plaintiff's PFRS pension once the parties are divorced. If in fact defendant is no longer eligible for that benefit after this divorce, plaintiff shall name defendant as beneficiary of at least $250,000 of the life insurance in place now on his life. If defendant does not have proof of her status with respect to the survivor benefit, she shall inform counsel who shall provide the proof to defendant. If defendant remains eligible for the survivor benefit, plaintiff shall provide proof that she is the named beneficiary. If she is no longer eligible, plaintiff shall provide proof that she is the named beneficiary of insurance on his life with a face value of at least $250,000.

Under N.J.S.A. 43:16A-1(24)(b) and -12.1, it is clear that defendant is no longer eligible for the survivor benefit. However, the judge did not require plaintiff to maintain a $250,000 life insurance policy securing defendant's equitably acquired share of plaintiff's PFRS pension benefits in the event of plaintiff's death. Instead, the judge imposed the requirement to secure defendant's alimony award as permitted by law. See Konczyk v. Konczyk, 367 N.J. Super. 512, 515 (App. Div. 2004) (noting that "parties may use various devices, such as life insurance or trusts, to secure an alimony obligation"); see also N.J.S.A. 2A:34-23. In the DJOD, the judge specified:

Plaintiff shall maintain insurance on his life with a face value of at least $250,000 with defendant as the sole, named beneficiary of the death benefit, <u>so long as plaintiff has an alimony obligation to defendant</u>. This provision can be satisfied by proof to defendant and the court that defendant is the named recipient of the survivor benefit on plaintiff's pension and that she remains eligible after the parties are divorced.

[(Emphasis added).]

Accordingly, there was no error by the judge and no abuse of discretion in the judge's decision to limit the life insurance policy to $250,000.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION